Raymond SCHNETZLER, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendant.

No. 06cv5860(ADS)(ARL).

United States District Court, E.D. New York.

Feb. 5, 2008.

Binder & Binder, P.C. by Charles E. Binder, Esq., of Counsel, New York City, for Plaintiff.

United States Attorney, Eastern District of New York by Diane Leonardo Beckmann, Assistant U.S. Attorney, Central Islip, NY, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Raymond Schnetzler ("Schnetzler" or "the plaintiff") commenced this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final determination of the Commissioner of Social Security (the "Commissioner") that denied disability benefits to him.

Currently before the Court are motions by the Commissioner and the plaintiff pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings.

## I. BACKGROUND

### A. Procedural History

On February 24, 1993, Schnetzler filed an application for social security disability benefits alleging a disability and inability to work since June 16, 1991 due to a herniated disc and two bulging discs in his back. His application was denied and there is no indication in the record that he appealed from that ruling. Schnetzler filed a new application on April 4, 1995. After this application and request for reconsideration was denied, he requested a hearing before an administrative law judge.

On August 6, 1997, a hearing was held before Administrative Law Judge Katherine C. Edgell ("ALJ Edgell"). At the hearing, Schnetzler amended his claim to include only the closed period from June 16, 1991 through September 11, 1996 to reflect a return to work on September 12, 1996. After the hearing, in a decision dated September 20, 1997, ALJ Edgell denied Schnetzler's claim for disability benefits. The Appeals Council granted Schnetzler's request for review and remanded the case for further proceedings on December 22, 1999. After a supple-

mental hearing on June 23, 2000 and another denial by ALJ Edgell, the Appeals Council remanded the case and directed reassignment to another ALJ.

Following two hearings, Administrative law Judge Marilyn Hoppenfeld ("ALJ Hoppenfeld" or "the ALJ") denied Schnetzler's claim, finding that he was not disabled from sedentary work during the relevant period. On September 8, 2006, the Appeals Council denied Schnetzler's request for review. Schnetzler commenced this action on October 30, 2006.

## B. *The Record*

### 1. The Plaintiff's Background and Testimony

Schnetzler was born January 4, 1965, and was 26 years at the onset of his claimed disability on June 16, 1991. He has a high school education and was working as a maintenance mechanic and porter in a building when he sustained the injury that is the basis for his claim. This employment required him to tend to and maintain various items in the building, such as doors, bells, lighting, sheet-rock, and tiling.

At the hearing before ALJ Hoppenfeld, Schnetzler testified that he sustained a back injury while pushing a heavy dumpster filled with debris at work on June 16, 1991. Schnetzler stated that he heard a "pop" and fell to the floor while pushing the container. Following this incident, he was taken by ambulance to Jamaica Hospital. Schnetzler testified that he weighed approximately 300 pounds at the time of the accident.

The plaintiff stated that following the accident, he saw a physical therapist, his family physician, Dr. Graff, a chiropractor, and a specialist. In addition, Schnetzler testified that from 1991 to 1996, he experienced constant back pain as well as numbness and tingling in his hands and legs as a result of the accident.

In a disability form filed with the Social Security Administration on April 4, 1995, Schnetzler stated that his roommate did the cleaning and the shopping, and he was able to do some light cooking. He wrote that he watched TV and read for recreation. Further, Schnetzler reported that he would drive only in an emergency. Also, in that and an additional form, dated April 19, 1995, the plaintiff stated that his doctors advised him not to work.

Schnetzler testified that during the period of his disability, he was unable to walk for more than two blocks or stand for more than ten minutes before having to sit down. He also stated that he could not sit for more than ten or fifteen minutes at a time and he could not bend or kneel. The plaintiff stated that the medications he took relieved his pain for a few minutes, but caused him to be "very, very tired all the time." (Tr. 390). He never underwent back surgery because he was "afraid." (Tr. 390).

### 2. Relevant Medical Evidence

### a. Jamaica Hospital

Schnetzler was taken to the Jamaica hospital by ambulance following his accident on June 16, 1991. An x-ray was taken of his lumbar spine. The x-ray report revealed "minimal anterior wedging of L2 vertebral body...." (Tr. 166). Further, the report stated that there were minimal sclerotic changes to both sacroiliac joints and concluded that a "[c]linical correlation, regarding injury to L2 area is suggested." *Id.* Schnetzler was diagnosed with a lower back strain and was prescribed Motrin and Robaxin.

### b. Robin Graff, M.D.—Treating Physician

Dr. Robin Graff completed a physician's report for the Department of Social Services, Office of Disability Determinations

on May 13, 1993. He noted that he had seen Schnetzler monthly since June 17, 1991, shortly after his accident. He listed the plaintiff's symptoms as constant back pain with radiation down the back of his legs. He noted that Schnetzler had a compression fracture at L2. His flexion-extension was limited to 45 degrees and his lateral flexion was limited to 15 degrees on both the right and left sides.

Dr. Graff also indicated that Schnetzler walked with a limp and had to stop walking at times. His lifting was limited to ten pounds, his standing and walking was limited to less than two hours per day, and his sitting was limited to less than six hours per day. Dr. Graff indicated that pushing and pulling were very limited and "not recommenced at all." (Tr. 112). Schnetzler's treatment included exercise and physiotherapy, which at times exacerbated his symptoms. Finally Dr. Graff concluded that Schnetzler's obesity was "certainly not doing his back any good." (Tr. 113).

### c. Philip Harris, M.D.—Consultative Physiatrist

Dr. Philip Harris, a specialist in physical medicine and rehabilitation saw Schnetzler on July 2, 1991. Dr. Harris noted that the plaintiff complained of a back ache with pain radiating down his legs and pain in his shoulder, going down his arms. The plaintiff also complained of numbness in his arms and legs upon waking, which dissipated after moving for a few minutes.

Dr. Harris found that Schnetzler was able to walk on his heels and toes with slight difficulty. Forward flexion of the spine was greatly limited with accompanying complaints of lower back pain, and a crackling sound with range of motion of the spine. However, Schnetzler's side bend and extension were within normal limits and there was no radiating pain with leg raises. His hip rotation was slightly decreased and caused a pulling sensation in the abductors. Further, palpation of Schnetzler's spinous process of his lumbar spine created pain.

Dr. Harris diagnosed Schnetzler with a lumbar sprain and thoracic outlet syndrome. Dr. Harris recommended plain films (x-rays) and a CT scan of the lumbar spine. He recommended aggressive therapy to increase plaintiff's abdominal strength, range of motion, and general conditioning if the plaintiff's CT scan and x-rays were without structural abnormality. Finally, Dr. Harris stated: "At this time, the patient is totally disabled." (Tr. 128).

### d. Joseph C. Yellin, M.D.—Consultative Physician

Dr. Joseph Yellin, a neurologist, evaluated Schnetzler on July 22, 1991. Dr. Yellin indicated that Schnetzler complained of lower back pain, which was worse at night, and numbness in his hands and feet. Schnetzler also stated that the pain radiated up his legs and down his back. Dr. Yellin reported that Schnetzler was taking Motrin and Darvon for pain.

Dr. Yellin noted that Schnetzler was alert, oriented, and cooperative. In addition, cranial nerve testing was within normal limits and range of motion of his cervical spine was full. There was no arm drift nor motor weakness in the upper or lower extremities. The plaintiff's straight leg testing was positive to 80 degrees with complaints of pain down the thigh region. There was decreased lumbar flexion. The plaintiff was able to walk on his toes and heels, and had no difficulty changing position from supine to sitting and from sitting to standing.

Dr. Yellin noted that a CT scan of Schnetzler's lumbosacral spine was normal. Dr. Yellin's impression was that the plaintiff suffered a lumbosacral strain. In addition, Dr. Yellin stated that Schnetzler

appeared "to be suffering from an associated mild post-traumatic anxiety syndrome." (Tr. 131). Dr. Yellin advised Schnetzler to continue seeing the referring physician and to continue an aggressive physical therapy program. Finally, Dr. Yellin stated that "[i]f the patient remains symptomatic, then EMG Nerve Conduction Studies may be warranted." *Id.*

### e. Fred Montas, M.D.—Treating Physician

Dr. Fred Montas was Schnetzler's treating orthopedic surgeon. Dr. Montas first saw Schnetzler on November 11, 1991, five months after the accident. Dr. Montas noted that the plaintiff's chief complaint was lower back pain and he was taking Motrin and Robaxin to alleviate his pain. At that time, Schnetzler was receiving physical therapy three times a week. Dr. Montas found that Schnetzler was disabled and recommended that he continue physical therapy.

On November 18, 1991, Dr. Montas noted that Schnetzler was still experiencing lower back pain and recommended continued physical therapy. Dr. Montas also referred Schnetzler to vocational therapy. Dr. Montas examined Schnetzler again on December 9, 1991, January 6, March 2, April 27, and June 29 1992. He noted that the plaintiff continued to have lower back pain, used a cane for walking, and ambulated with an antalgic gait. Dr. Montas requested an EMG, NCV and, MRI of the plaintiff's lumbosacral spine. Dr. Montas diagnosed the plaintiff as disabled and prescribed Darvocet for his pain.

An MRI report dated July 10, 1992 and addressed to Dr. Montas indicated that Schnetzler suffered from mild degenerative disease at L2–L3 with mild disc space narrowing. In addition, the report noted "a prominent exiting nerve root sleeve at L5–S1 on the right likely representing a Tarlov's cyst or conjoined nerve root."

(Tr. 235). Further, the report indicated "a very small central protrusion of the L3–L4 disc consistent with a tiny central disc herniation . . . . [and] some mild bulging of the L2–L3 disc." (Tr. 233).

On August 3, 1992, Schnetzler complained to Dr. Montas of worsening back pain everyday. In addition, the plaintiff's pain radiated to his lower extremities and was combined with numbness of the lower extremities. Once again, Dr. Montas noted that Schnetzler was disabled. Further, on August 31, 1992, Dr. Montas examined Schnetzler and found that he was experiencing constant low back pain and that he was totally disabled.

On February 16, 1993, Dr. Montas noted that Schnetzler had EMG and nerve conduction studies in December of 1992, the results of which were within normal limits. Again, Dr. Montas opined that Schnetzler was totally disabled and referred him to a neurologist.

Dr. Montas completed an undated report of his treatment of Schnetzler. Dr. Montas related the circumstances of Schnetzler's injury and that his chief complaint was constant pain of the lower back, aggravated by bending with inability to lift, carry, run, and climb stairs. Schnetzler reported not being able to carry out his activities of daily living, such as shopping, cleaning, and sitting for extended periods. The plaintiff related that wearing his back-brace (L–S corset) aggravated his back pain.

Dr. Montas' diagnosis was a small central herniated disc of the lumbar spine and spinal stenosis. As to disability, Dr. Montas stated "[t]he presence of herniated disc of the Lumbar spine and Spinal Stenosis indicates lesions causing a disability that is permanent. With a reasonable degree of medical certainty these injuries were caused by the accident of 06/16/91. As of February 16th 1993 the patient was totally

and permanently disabled from work." (Tr. 225). Schnetzler's prognosis for a full recovery was poor.

Dr. Montas completed an evaluation at the request of the Social Security Administration on May 10, 1993 (Tr. 96–104). Dr. Montas indicated that he had been treating the plaintiff since November 11, 1991 and his treating diagnosis was small disc herniation at L3–4, congenital stenosis of the spine, and prominent exiting nerve root at L5–S1. Schnetzler's current symptoms were constant back pain, aggravated by activity. He was treated with analgesics (Darvocet) and home physical therapy. Dr. Montas related the events causing Schnetzler's injury and reported clinical findings, which included a mild limp, tenderness at the L–S region and SI joints, painful side bending to the right and left at 10 degrees, as well as flexion and extension, positive straight leg raising bilaterally, and difficulty squatting. Dr. Montas concluded that Schnetzler was limited to lift and carry up to ten pounds occasionally, stand or walk up to two hours per day, and sit up to six hours per day.

### f. Paul Shashaty, D.C.—Treating Chiropractor

On August 14, 1992 and August 11, 1993, Dr. Paul Shashaty completed Attending Doctor's Reports for the Workers' Compensation Board regarding Schnetzler's condition. Dr. Shashaty described Schnetzler's condition as chronic lumbosacral sprain-strain, low back pain, bulging and mild degenerated L2–L3 disc, L3–L4 disc herniation, mild congenital lumbar spinal canal stenosis, L3 vertebral body Schmorl's node. Dr. Shashaty's treatment included chiropractic spinal adjustment, flexion-distraction traction. He noted that Schnetzler experienced minor relief after adjustment, traction, and electrical muscle stimulation.

On May 27, 1993 Dr. Shashaty completed a narrative describing his treatment of Schnetzler. Dr. Shashaty stated that the plaintiff had been under his care for a work-related low-back injury since July of 1992 and that two years after his injury, Schnetzler was still experiencing low back pain, with mild to moderate improvement at times with chiropractic care and physical therapy. Dr. Shashaty noted that Schnetzler's pain was so severe at times that his legs would become weak and he would fall to the ground. Finally, Dr. Shashaty opined: "Considering the nature of the tissues involved in the injury (ligamentous discs) and the time since the accident, it is my professional opinion that the patient will not experience any long term improvement. The prognosis is bleak." (Tr. 136).

Dr. Shashaty filed a report at the request of the Social Security Administration on May 27, 1993. He noted that his treating diagnosis was a chronic lumbosacral sprain-strain; lumbar disc herniation; lumbar disc bulges; lumbar disc degeneration; moderate congenital lumbar spinal stenosis; L3 body Schmorl's node due to the accident; and low back pain. Dr. Shashaty stated that severe exaberations of pain disabled Schnetzler, causing his legs to give out. Schnetzler exhibited a waddle, or antalgic walk. His flexion-extension was limited to 30 degrees due to pain and lateral flexion was limited to 15 degrees due to pain. A treatment program of lumbar intersegmental traction, chiropratic spinal adjustment, and electric muscle stimulation produced mild to moderate improvement for one to two days. Further, Schnetzler used a cane and L–S support belt for severe exacerbations of pain.

Dr. Shashaty completed a follow-up narrative of his treatment on March 21, 1994. He noted that Schnetzler had been his

patient for nearly two years and was three years post-injury. He stated that the plaintiff was still experiencing severe exacerbations of pain, so severe at times that his legs weaken and he falls to the ground. Again, Dr. Shashaty opined that Schnetzler would not experience any further improvement and that further care would be for the purpose of temporary relief of pain. He recommended treatment at a rate of two to three times per month. Dr. Shashaty repeated these findings in Treating Doctor's Reports on January 16, 1995 and February 23, 1995.

Dr. Shashaty's final narrative with regard to his treatment of Schnetzler was on October 18, 1996. He stated that Schnetzler was under his care from July 16, 1992 until February 24, 1995. Schnetzler informed Dr. Shashaty that he attempted to train for a mechanic's position for the United States Parcel Service during the previous summer. During training, Schnetzler experienced occasional pain of a mild to moderate nature when bending and lifting light objects. When required to lift heavier objects, Schnetzler experienced weariness, weakness, and faintness. Upon Dr. Shashaty's recommendation, Schnetzler left that training position and found one that did not require bending or lifting.

Dr. Shashaty's examination of Schnetzler on October 14, 1996 showed forward flexion limited to 70 degrees due to pain at the L3–L5 level and straight leg raises produced low back pain in the same area at 75 degrees. Dr. Shashaty noted that five years had passed since the date of Schnetzler's injury and he had responded well to conservative treatment. Shashaty found that the plaintiff had reached his maximum medical improvement and that he had "a remaining moderate permanent partial disability." (Tr. 194).

### g. Richard Radna, M.D.—Treating Neurosurgeon

Dr. Richard Radna first examined Schnetzler on June 14, 1993 upon the referral of Dr. Graff. Dr. Radna noted that Schnetzler reported being in good health until he injured his lumbo-sacral spine and had since experienced persistent lumbosacral pain with radiation down both lower extremities, involving all toes and both feet. On physical examination, Dr. Radna observed "moderate para-vertebral spasm in the lumbo-sacral region with moderately diminished range of motion around the lumbo-sacral spine secondary to pain." (Tr. 133). Schnetzler's straight leg raising was moderately restricted.

An MRI of Schnetzler's lumbo-sacral spine showed an extruded disc at the L5–S1 level, predominately on the left side. In addition, Dr. Radna noted: "Impression is that of a causally-related lumbo-sacral, musculo-skeletal and radicular pain syndrome. The level of causally-related disability is total." (Tr. 134). Dr. Radna recommended completion of plain films and a CT scan of the lumbo-sacral spine. Dr. Radna's interim recommendation was aggressive weight loss and the use of a spinal brace.

Dr. Radna examined the plaintiff again on July 19, 1993 and found that Schnetzler presented with the same symptoms upon physical examination. Again, Dr. Radna opined that Schnetzler's causally-related disability was total. Dr. Radna prescribed Percocet, Vistaril and Valium.

### h. Juan Fiks, M.D.—Independent Psychiatrist

Dr. Juan Fiks, performed a psychological examination on Schnetzler on June 18, 1993 at the request of the New York Bureau of Disability Determinations. Dr. Fiks related the circumstances of Schnetzler's injury and stated that the plaintiff

complained of low back pain. He also noted that Schnetzler was extremely obese and put on weight after his accident.

Dr. Fiks stated that Schnetzler complained of being anxious and irritable and had trouble sleeping. His psychological examination revealed possible dull normal to borderline intelligence. Dr. Fiks noted that Schnetzler spent much of his time going to doctors and could not engage in many activities because of his back pain. Dr. Fiks diagnosed anxiety disorder in a person involved in a work related accident and a dependant personality. Dr. Fiks stated that Schnetzler had a good psychiatric prognosis and did not require psychiatric care.

### i.  Manoucher Amini, M.D.—Independent Physician

Dr. Amini examined Schnetzler at the request of the New York Bureau of Disability Determinations on June 13, 1995. He noted that Schnetzler complained of back pain, difficulty sitting, standing, walking, lifting, carrying, pushing, and pulling objects. Dr. Amini found Schnetzler to be "[r]ather obese [,] walking slowing without any limping with moderate discomfort sitting up from a lying down position, no means of external support." (Tr. 120). In addition, Dr. Amini found that the plaintiff was able to stand and walk on his toes and heels with significant discomfort. His straight leg raise test was positive in the 70 degree elevation of the right and left legs in supine, but negative in standing.

Dr. Amini's diagnosis was chronic lumbosacral spinal strain with right radiculopathy and a history of small herniated disc and bulging disc of lumbar spine. The doctor's prognosis was "guarded" and he recommended that the patient continue medical care by his own regular physician.

### j.  Dr. Rhansali—State Insurance Fund Physician

On June 4, 1992, Dr. Rhansali examined Schnetlzer on behalf of the New York State Insurance Fund. He noted that Schnetzler ambulated with a mild antalgic gait. He observed marked tenderness at L5–S1, but no tenderness at L2. Dr. Rhansali noted sacral notch tenderness on the right and slight weak plantar reflex. Schnetzler's range of motion on the lumbar spine was limited in forward flexion to 60 degrees, and side to side flexion was limited on both sides.

Dr. Rhansali diagnosed a lumbar sprain with no change in clinical symptoms after three months of physical therapy. Dr. Rhansali also stated that Schnetzler was unable to return to work, characterizing his disability as "temporary moderate disability." (Tr. 133). Dr. Rhansali recommended continued physiotherapy 2 to 3 times a week for 4 to 6 weeks.

### k.  Dr. Imperato—New York Workers' Compensation Board Physician

Dr. Imperato examined Schnetzler on behalf of the New York State Workers' Compensation Board on July 28, 1993. He noted that Schnetzler complained of constant lower back pain with radiation to the lower extremities and numbness in the right lower leg. Further, Schnetzler's MRI was positive for herniated discs.

Dr. Imperato's examination revealed a flattening of the lumbar lordosis with spasms of the lumbar muscles. In addition, all motion of the lumbar spine was restricted in all planes and the SLR was restricted in both lower limbs. Dr. Imperato found Schnetzler to have a permanent partial disability.

### 1. J.B. Jabmin, M.D.—Social Security Administration Physician

On June 27, 1995 Dr. Jabmin completed a Residual Physical Functional Capacity Assessment on behalf of the Social Security Administration, and concluded that Schnetzler could occasionally lift or carry twenty pounds, and frequently lift or carry ten pounds. Further, he found that Schnetzler could stand or walk about six hours per day, and could sit for six hours per day. However, Schnetzler could not climb ropes, ladders, crouch or crawl due to his herniated disc.

### 3. Expert Testimony

### a. Donald Goldman, M.D.—Medical Expert

Dr. Donald Goldman, an orthopedic surgeon and a member of the expert panel maintained by the Office of Hearings and Appeals testified as a medical expert before ALJ Hoppenfeld. Dr. Goldman testified that the tests performed on Schnetzler revealed spinal stenosis and a herniated disc at L3 and L4. Further, Schnetzler had a bulging disc that lead to a thecal sac impingement. The doctor stated that Schnetzler's spinal stenosis was congenital. Dr. Goldman noted that many evaluations found Schnetzler to have restricted range of motion and positive straight leg raises limited to between 30 and 60 degrees. Schnetzler also had low back spasms, numbness and tingling in his legs, and occasional reflex deficits and weakness on range of motion in his legs.

Dr. Goldman testified that in his opinion, between 1991 and 1996, Schnetzler would have met a listing level of 1.04C. Upon questioning by the ALJ about his basis for finding nerve involvement, Dr. Goldman stated that "there was changes in sensations in his legs. There was positive straight leg raise. There was positive fatigue." (Tr. 411). Dr. Goldman stated that although Schnetzler's spinal stenosis was congenital, his condition improved over time due to a reduction in the inflammation of the nerves and discs that resulted from his injury. Finally, Dr. Goldman testified that during the period between 1991 and 1996, Schnetzler could not stand, walk, or sit for six hours each day and could not even perform sedentary work.

### b. Andrew Pasternak—Vocational Expert

Vocational Expert Andrew Pasternak, a member of the expert panel maintained by the Office of Hearings and Appeals, testified before ALJ Hoppenfeld. Mr. Pasternak testified that Schnetzler's previous work experience qualified as unskilled porter/construction work with a potentially heavy level of physical exertion, depending upon the individual duties. Mr. Pasternak testified that Schnetzler could not perform the same type of work that he did prior to his accident.

However, Mr. Pasternak found that during the relevant period, Schnetzler could have performed other, sedentary jobs not requiring decision-making. Hypothetically, Mr. Pasternak posited jobs such as machine tender (4,900 positions locally and 90,000 positions nationally), sedentary unskilled assembly jobs (5,000 positions locally and 101,000 nationally), or document preparer (5,000 jobs locally and 161,000 nationally) would be appropriate for a person of Schentzler's residual functional capacity. Mr. Pasternak testified that an individual with Schnetzler's condition should be able to perform the cited jobs with minimal stooping or bending.

### 4. Diagnostic Tests

An x-ray was performed on Schnetzler's spine after he was transported to Jamaica Hospital on June 16, 1991. The report revealed "minimal anterior wedging of L2 vertebral body without significant degen-

erative osteoarthritic changes. Disc spaces and the pedicles are intact. Both sacroiliac joints show minimal sclerotic changes. Clinical correlation, regarding injury to L2 area is suggested." (Tr. 166).

Also, included in the record is an MRI of Schnetzler's lumbar spine, performed by Pacific Street MRI on July 10, 1992. The initial impression indicated:

> Mild degenerative disc disease at L2–L3 with mild disc space narrowing. There is moderate congenital lumbar spinal stenosis. There is a prominent exiting nerve root sleeve at L5–S1 on the right likely representing a Tarlov's cyst or conjoined nerve root. If the patient had symptoms referable to the S1 or S2 nerve root on the right, a follow-up contrast enhanced examination is suggested for further evaluation.

(Tr. 235). Further, an addendum to the initial report stated:

> In addition to the previously described findings on the axial images, there does appear to be a very small central protrusion of the L3–L4 disc consistent with a tiny central disc herniation. This cannot be confirmed on the sagittal images. The L3–L4 disc is of normal height and signal intensity. A CT could be obtained for further evaluation as clinically warranted.... There is some mild bulging of the L2–L3 disc.

(Tr. 233).

In addition, x-ray tests were performed on Schnetzler's spine on June 13, 1995. The radiology report concludes that Schnetzler's lumbar spine is normal, stating:

> The vertebral bodies are in normal alignment. There is no evidence of old or recent fracture. There are no destructive or productive osseous changes. The posterior facet joints and intervertebral disc spaces are intact. The pa-

ravertebral soft parts are unremarkable. Both sacroiliac joints are normal.

(Tr. 122).

In addition, according to the account of Dr. Yellin, a CT scan of Schnetzler's lumbosacral spine was performed shortly after Schnetzler's injury, and was normal. Also, according to Dr. Montas, Schnetzler underwent EMG and nerve conduction studies in December of 1992, the results of which were within normal limits. Despite the anecdotal mention of these additional diagnostic tests, the formal reports are not in the record.

### C. The ALJ's Findings

In her January 20, 2006 decision, ALJ Hoppenfeld denied Schnetzler's disability claim for the period between June 16, 1991 and September 1, 1996. Based upon the evidence presented, ALJ Hoppenfeld found that the plaintiff was not disabled for that period within the meaning of the Social Security Act. The ALJ determined that the plaintiff had a lumbar sprain/strain and a history of congenital canal narrowing, mild anxiety, and obesity, the combination of which could be considered severe of they caused significant vocational limitations. However, the ALJ found that Schnetzler's medically determinable impairments did not meet or equal the impairments listed in the regulations. The ALJ concluded that Schnetzler was unable to perform his past relevant work as a construction worker/porter, but he was capable of performing a significant number of sedentary jobs during the period in question.

The ALJ found that the plaintiff did not engage in substantial gainful activity between June 16, 1991 and August 31, 1996, his alleged closed period of disability. As stated above, the ALJ found that during the relevant period, the plaintiff had a lumbar sprain/strain and a history of con-

genital canal narrowing, mild anxiety, and obesity. However, following a review of the medical records, the ALJ determined that the plaintiff "was capable of sitting for six hours in an eight hour day and standing and walking for two hours in an eight hour day and could lift ten pounds occasionally." (Tr. 30). Further, the ALJ found that the plaintiff "was capable of simple, repetitive non-decision making jobs, known as low stress ..., such as machine tender, various types of assembly jobs and document preparer." (Tr. 30). The ALJ afforded some weight to the treating physicians, Dr. Harris, Dr. Yellin, Dr. Shashaty, Dr. Montas, Dr. Graff, and Dr. Radna. However, the ALJ did not afford any weight to the testimony of Dr. Goldman, the medical expert.

The ALJ noted that Dr. Harris diagnosed Schnetzler as status post lumbar sprain and thoracic outlet syndrome. She stated that upon examining Schnetzler, Dr. Harris found forward flexion of the lumbar spine was limited, by complaints of low back pain, but side bending was within normal limits and there was no radiating pain with leg raise. The ALJ stated that Dr. Yellin found Schnetzler to have decreased lumbar flexion, but had no motor weakness in the upper and lower extremities, and no difficulty in changing from supine to sitting and sitting to standing. The ALJ related Dr. Yellin's diagnosis of lumbosacral strain and a potentially associated mild post traumatic anxiety syndrome.

ALJ Hoppenfeld also noted that Dr. Montas recommended home physical therapy and submitted a residual functional capacity assessment, opining that the plaintiff could lift and carry ten pounds; could stand and walk up to two hours in an eight hour day; and could sit for up to six hours in an eight hour day. As to Dr. Graff's findings of limited range of motion, the ALJ stated: "While claimant has some

limitations they were not to such a degree that it would interfere with standing and walking for two hours in an eight hour day." *Id.* The ALJ stated that Dr. Graff "suggested a compression fracture of L2, but offered no objective evidence of this nor did he suggest any further testing to confirm this opinion." (Tr. 26). Finally, the ALJ said that she was not according great weight to Dr. Graff's opinion that Schnetzler could lift and carry up to ten pounds, but could not stand and walk for two hours per day and sit for six hours per day because Dr. Graff did not supply objective findings to support his opinion, which was contradicted by his observed degrees of limitation.

The ALJ also considered the decision of Dr. Radna. She noted that Dr. Radna's impression of Schnetzler's MRI study showed an extruded disc at the L5–S1 level, predominately on the left side. Dr. Radna's impression was lumbosacral, musculoskeletal and radicular pain syndrome. Dr. Radna recommended a spinal brace and aggressive weight loss. However, the ALJ did not give controlling weight to Dr. Radna's opinion that Schnetzler was disabled because the opinion was addressed to the Workers' Compensation Board and its definition of disability is not binding on Social Security.

As to the statement of Dr. Shashaty, Schnetzler's chiropractor, the ALJ stated that other than noting the MRI performed on July 10, 1992, Dr. Shashaty supplied no objective findings. The ALJ also noted Dr. Shashaty's recommendation of continued care for the temporary relief of pain. The ALJ stated that she was not giving great weight to Dr. Shashaty's report, but "considered [it] as a chiropractor." (Tr. 25).

The ALJ reviewed the opinion of independent physician Dr. Amini. Dr. Amini found that the plaintiff walked slowly with-

out any limp with moderate discomfort sitting up from a lying down position, with no means of external support. Dr. Amini's examination of the upper extremities found normal range of motion of the elbows, wrists, and fingers. Examination of the lower extremities found that the plaintiff could walk on his toes and heels with complaints of discomfort. Straight leg raising was 70 degrees on the right and left in a supine position and negative in a seated position, with normal leg strength. The lumbosacral spine had forward flexion 88; extension 25; lateral flexion to the right and left at 17 with moderate discomfort.

The ALJ noted that Dr. Amini diagnosed a lumbosacral strain with right radiculopathy and a history of a small herniated disc and a bulging disc of the lumbar vertebrae. Dr. Amini found that the plaintiff had moderate limitations of sitting, standing, walking, bending, climbing, lifting, carrying, and pushing and pulling objects.

The ALJ also reviewed the plaintiff's testimony. The ALJ noted that the plaintiff testified that he did not undergo any operations and that the medications prescribed for him made him tired and the muscle relaxer only lasted for a few minutes before his pain would return. Further, the ALJ noted the plaintiff's testimony that he could only walk two blocks before having to stop and sit, could only stand for ten minutes and then had to lie down; could not bend or kneel; and could sit only for ten to fifteen minutes. However, the ALJ declined to consider the plaintiff's testimony in arriving at a residual functional capacity because she found that it was not supported by the substantial medical evidence. The ALJ found that there was no evidence of any significant neurological deficits. In addition, the ALJ held that "most of the opinions were based upon claimant's subjective complaints of

pain. The examinations were within normal limits." (Tr. 28).

The ALJ determined that the plaintiff had a physical residual functional capacity during the relevant period for a wide range of sedentary work. The ALJ found that Schnetzler was capable of sitting for six hours in an eight hour day and standing and walking for two hours in an eight hour day and could lift ten pounds occasionally. The ALJ determined that the plaintiff was 26 to 31 years of age during the closed period and therefore, pursuant to the regulations, he was a younger individual. The ALJ concluded that, considering Schnetzler's age, educational background, and residual functioning capacity, he was capable of simple, repetitive, non-decision making jobs during the closed period. Thus, the ALJ concluded that Schnetzler was not disabled for the period between June 16, 1991 and September 1, 1996.

On September 8, 2006, the Appeals Council denied the plaintiff's request for review.

## II. DISCUSSION

### A. Standards of Review

When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record. See 42 U.S.C. § 405(g); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir.2003); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999); *Brown v. Apfel*, 174 F.3d 59, 61–62 (2d Cir.1999). Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)), and requires such relevant evi-

dence that a reasonable person "might accept as adequate to support a conclusion." *Brown*, 174 F.3d at 62–63.

In addition, the Commissioner must accord special evidentiary weight to the opinion of the treating physician, so long as the treating physician's opinion is supported by medically acceptable techniques, results from frequent examinations, and is consistent "with the other substantial evidence in [the] case record." *See Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998). When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must give "good reasons in his notice of determination or decision for the weight he gives the claimant's treating source's opinion." *Id.*

When determining whether the Commissioner's findings are supported by substantial evidence, the Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983). Further, the Court must keep in mind that "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark*, 143 F.3d at 118. Therefore, when evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

A reviewing court may "enter upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decisions of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). When deciding whether to remand, an important factor that the court should consider is whether further findings would plainly help to assure the proper disposition of the claim. *Rosa*, 168 F.3d at 83. "In deciding whether a remand is the proper remedy, we have stated that where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate." *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir.2004).

**B. *Analytical Framework***

To qualify for disability benefits under 42 U.S.C. § 423(d)(1)(A), a plaintiff must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than twelve months." *Butts*, 388 F.3d at 383. The Act also states that the impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.*

Federal regulations set forth a five step analysis that the ALJ must follow when evaluating disability claims:

1) The ALJ will consider whether the claimant is engaged in substantial gainful activity.

2) The ALJ will consider whether the claimant has a severe medically determinable physical or medical impairment which will impair the claimant from doing basic work activities

3) The ALJ will consider whether the claimant's severe medical impairment, based solely on medical evidence, is a limitation that is listed in Appendix 1 of the regulations.

4) The ALJ will consider an assessment of the claimant's residual functional ca-

pacity and ability to continue past relevant work despite severe impairment. 5) The ALJ will consider an assessment of the claimant's residual functional capacity along with age, education, and work experience. Here the burden shifts to the ALJ to show that the claimant can perform alternative work. 20 C.F.R. §§ 404.1520, 416.920.

◾ When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience. *Mongeur*, 722 F.2d at 1037.

## C. *Analysis*

Based upon the medical and non-medical evidence, the ALJ determined that the plaintiff was limited by his injuries and could not return to his past relevant work. Based on her physical residual functional capacity determination, the ALJ concluded that despite the impairments, Schnetzler could perform sedentary work. However, Schnetzler contends that the ALJ failed to find that he is *per se* disabled under Medical Listing 1.04A; failed to indicated what weight, if any, she gave to the medical expert, Dr. Goldman; and failed to properly evaluate the medical evidence from his treating physicians. In addition, Schnetzler claims that the ALJ's decision failed to properly evaluate the plaintiff's credibility and subjective complaints of pain.

### 1. The Treating Physician Rule

◾ The ALJ is required to accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques, results from frequent examinations, and is supported by the administrative record. *See Clark*, 143 F.3d at 119. The "treating

physician rule," as it is known, "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir.2000); *see also Rosa*, 168 F.3d at 79; *Clark*, 143 F.3d at 119.

◾ If the opinion of the treating physician as to the nature and severity of the impairment is not "well-supported" by objective evidence, the obligation to give controlling weight to a treating physician's opinion is inapplicable. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993). When controlling weight is not given to a treating physician's medical opinion, the ALJ must consider various "factors" to determine how much weight to give the opinion, such as: (1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004). Furthermore, the ALJ must provide "good reasons" for not crediting the opinion of a plaintiff's treating physician. *See* 20 C.F.R. § 416.927(d)(2); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998)).

Here, the ALJ rejected the finding of disability of four of Schnetzler's treating physicians, including two specialists, Dr. Radna, a neurologist, and Dr. Montas, an orthopedic surgeon. The ALJ stated that the findings of Dr. Graff were not given great weight because he did not supply objective findings to support his opinion and his diagnosis was contradicted by his

degrees of limitation of Schnetzler's range of motion. Also, as to the report of Dr. Shashaty, the ALJ stated that it was not given great weight, but was "considered as a chiropractor." (Tr. 25). In addition, the ALJ did not accord controlling weight to the opinion of Dr. Radna, because "Dr. Radna's opinion of claimant's disability was addressed to the Workers' Compensation Board and their definition of disability is not binding upon Social Security." (Tr. 27).

■ However, the ALJ declined to give controlling weight to the findings of Schnetzler's treating physicians, namely, Dr. Montas, Dr. Harris, and Dr. Yellin, without a full explanation of what factors she reviewed in rejecting their findings. Further, the ALJ did not explain what weight she accorded to the opinions of those physicians, stating only that "[g]reater weight was given to the medical consultant's findings, hereinafter set forth above and below from a neurologist and orthopedist." (Tr. 25).

The Court finds that the ALJ failed to adequately explain what good reasons she had in discounting the opinions of Schnetzler's treating physicians. The ALJ found that Schnetzler's exertional limitations were consistent with the requirements of sedentary work. However, the report of Dr. Graff found that the plaintiff could occasionally lift up to ten pounds a day, but could stand or walk for less than two hours per day, could sit for less than six hours per day, and could not push or pull. Dr. Shashaty, the plaintiff's chiropractor, also found that Schnetzler could not lift or carry any weight, was limited to standing or walking for less than two hours per day, could not sit for more than thirty minutes at a time, and could not push or pull. Even Dr. Montas, who found that the plaintiff could lift up to ten pounds per day, could stand or walk up to two hours per day, and sit up to six hours per day, a

finding consistent with sedentary work, noted several times the Schnetzler was totally disabled.

Although it cannot be said that the ALJ's finding of functional capacity was wholly unsupported, the ALJ failed to indicate what factors were reviewed in her decision to not accord their opinions controlling weight. In addition, the testifying medical expert, Dr. Goldman, agreed with the assessments of Schnetzler's physicians and stated that he believed Schnetzler "could do nothing" during the closed period. (Tr. 413); *see Brown v. Barnhart*, 418 F.Supp.2d 252, 260–62 (W.D.N.Y.2005) (finding that the ALJ improperly substituted his own opinion for the opinions of the medical expert where the expert found that the plaintiff would have difficulty in maintaining employment because of a mental impairment). In fact, Dr. Goldman testified that during the period between 1991 and 1996, Schnetzler could not stand, walk, or sit for six hours each day, and significantly, could not even perform sedentary work. (Tr. 413).

Thus, the Court finds that the ALJ's total silence on the weight accorded to Dr. Harris, Dr. Yellin, and Dr. Montas was error because the ALJ failed to provide "good reasons" for discounting their opinions. *Snell*, 177 F.3d at 133–34 ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."); *Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Moreover, even though "some kinds of findings—including the ultimate finding of

whether a claimant is disabled and cannot work—are reserved to the Commissioner," that the ALJ's determination was not supported by substantial evidence is established by the findings of government consulting physicians. *Snell,* 177 F.3d at 133. ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative."). Dr. Amini, the Social Security consulting physician stated that his prognosis for Schnetzler's condition was "guarded." In addition, Dr. Imperato, the New York State Workers' Compensation Board physician found Schnetzler to have a permanent partial disability. Also, Dr. Rhansali, the State Insurance Fund Physician found Schnetzler to have a "temporary moderate disability."

Furthermore, the Court finds that the opinions of the plaintiff's treating physicians was supported by the record considering the length and frequency of their examinations of the plaintiff over the course of the period in question; the nature of their relationships with Schnetzler; the physicians' evidence in support of their opinions; and their opinions consistency with the record as a whole. There is no indication in the record that the ALJ considered any of these factors when viewing the opinions of Schnetzler's treating physicians and the ALJ failed to even acknowledge the treating physician rule. In addition, the results of the MRI performed on Mr. Schnetzler on July 10, 1992 indicated degenerative disc disease, protrusion of the L3–L4 disc consistent with a tiny central disc herniation, and prominent exiting nerve root sleeve at L5–S1. (Tr.233–35).

### 2. Listed Impairment

■ At steps one and two of the five step analysis, the ALJ found: (1) the plaintiff did not engage in substantial gainful activity between June 16, 1991 and August 31, 1996, his alleged closed period of disability; and (2) the plaintiff's lumbar sprain/strain could be considered severe, if they cause significant vocational limitations, based on the requirements in the Regulations 20 CFR § 404.1520(c). There is no dispute regarding the ALJ's findings regarding steps one and two. However, the plaintiff argues that the ALJ did not consider other Medical Listings in Appendix 1, and particularly failed find him *per se* disabled under disability under Listing 1.04A.

In her analysis of step three, the ALJ found that "[t]hese medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (Tr. 30). Further, she indicated that there was "no evidence of nerve root involvement that would cause disabling pain," in reviewing the plaintiff's residual functional capacity. (Tr. 28).

Medical Listing 1.04 applies to

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

. . . or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established

by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

The record is replete with observations by Schnetzler's physicians, recorded at various times, stating that the plaintiff presented with most of the symptoms indicated in Listing 1.04A. (*See, e.g.,* Tr. 230–32) (Dr. Montas noting pain radiating to right lower extremity); Tr. 105 (Dr. Graff noting back pain with radiation down the back of the legs); Tr. 120 (Dr. Amini noting pain radiation at the time of the accident); Tr. 224–31 (Dr. Montas noting limited motion of the spine); Tr. 127 (Dr. Harris noting great limitation of forward flexion); Tr. 137 (Dr. Shashaty noting weakness of the legs); Tr. 126 (Dr. Harris noting numbness of Schnetzler's arms and legs); Tr. 225–32 (Dr. Montas noting positive straight leg raises); Tr. 106 (Dr. Graff noting positive straight leg raise); Tr. 127 (Dr. Harris noting positive straight leg raise); Tr. 130 (Dr. Yellin noting positive straight leg raise).

In addition, at the hearing before ALJ Hoppenfeld, the medical expert Dr. Goldman testified that he believed Schnetzler met Medical Listing 1.04C contained in Appendix 1 of the regulations. The ALJ asked Dr. Goldman what his basis was for finding there was nerve involvement:

Q: And on what basis did you feel there was any nerve involvement?

A: Well number one there was changes in sensations in his legs. There was a positive straight leg raise. There was a positive fatigue.

Q: All right.

A: There was spasm guarding and restrictive range of motion. There was disk [sic] involvement and ___

Q: Did the MRI indicate any kind of exiting nerve involvement in the MRI?

A: No, but typically they don't show that, Your Honor. It would be the stenosis couple[d] with the herniations coupled with___

Q: But Doctor, if this was congenital and he was working before—

A: Um-hum.

Q: ___ he had the accident is it fair to say it still was congenital at the time between '91 and '96?

A: It's fair to say that, however, the therapy treatment and the number of years allowed that to subside to a certain extent. He also mentioned he's not 100 percent but he is better. So this would be a continuing issue, your Honor. How disabling is a different issue.

Q: If it's a narrowing of the spinal canal ___

A: Um-hum.

Q: ___ how could that improve if it's congenital?

A: The canal doesn't improve, as the medication rest, restriction of activity, the disk and nerves that had been inflamed during the accident—

Q: Oh, the inflammation,

A: ___ gradually subside.

Q: Oh, okay, the inflammation.

A: The inflammation subsides. That's why he was taking all that medication, Your Honor.

Q: Okay. But the—you can't make the spinal canal any larger.

A: No.

(Tr. 411–12).

The ALJ declined to defer to the opinion of the medical expert that Schnetzler met a 1.04 Medical Listing category, stating: "The opinion of the medical expert was not

supported by this record and the lack of neurological deficits and contradicted by the claimant's activities." (Tr. 27). However, a determination of whether Schnetzler's symptoms indicated nerve root involvement was a medical opinion and not the province of the ALJ. Thus, the ALJ improperly substituted her opinion for the observations of Schnetzler's physicians, and the opinion of the medical expert. *See Balsamo v. Chater*, 142 F.3d 75 (2d Cir. 1998) ("While an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him." (quoting *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir.1983) (internal quotation marks and citations omitted))); *Brown*, 418 F.Supp.2d at 262; *see also Pratts v. Chater*, 94 F.3d 34, 37–38 (2d Cir.1996) ("In a case such as this, where the assessment of disability involves careful consideration of medical evidence, the testimony of the only medical expert must figure prominently in the ALJ's decision making.").

■ In sum, the Court finds that the ALJ's decision was not supported by substantial evidence. However, because the Court finds that the ALJ applied an incorrect legal standard in according weight to the opinions of Schnetzler's treating physicians and the medical expert and in articulating the actual amount of weight she was according to each, the Court will remand this matter to the Commissioner for further consideration, rather than reverse the decision in its entirety. *Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir.2000) ("Upon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, we generally vacate and instruct the district court to remand the matter to the Commissioner for further consideration.").

### III.  CONCLUSION

Having reviewed the submissions of the parties and the findings by the Commissioner, the ALJ, and the Appeals Council, and for the reasons set forth above, it is hereby

**ORDERED,** that the motion by the Commissioner for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, is **DENIED;** and it is further

**ORDERED,** that the motion by the plaintiff for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, is GRANTED and the matter is remanded to the Commissioner for further consideration in accordance with this opinion; and it is further

**ORDERED,** that the Clerk of the Court is directed to close the case.

**SO ORDERED.**